Thank you, your honor. May it please the court. Leo Yeager appeals the denial of his motion to suppress evidence, specifically a firearm. Mr. Yeager filed that motion to suppress in the Northern District of Iowa. It was denied. He pled guilty pursuant to a conditional plea agreement preserving the right to appeal the denial of the motion to suppress. He's currently serving a 21-month prison sentence. Mr. Yeager's argument is that the district court erred by finding that his girlfriend, a woman named Samantha Zemke, provided voluntary consent for a search of a house that resulted in the discovery of the firearm for which Mr. Yeager was convicted. This case relies in Mr. Yeager's view on the Supreme Court's decision in Bumper v. North Carolina. In Bumper v. North Carolina, the Supreme Court held that in a circumstance where law enforcement makes a representation that it has the authority to conduct a search, and if a party accedes to that authority, then that's not a situation in which the government can rely upon the voluntary consent exception to the search warrant requirement. Essentially what the Bumper court said is that in that circumstance there is a level of coercion, of police coercion, and in that circumstance there cannot be consent that's deemed voluntary. This was a domestic disturbance in which Mr. Yeager committed an assault on his girlfriend, Ms. Zemke. Eventually Ms. Zemke went to the Humboldt County Sheriff's Department or Law Enforcement Center in Humboldt County, Iowa. This assault had taken place in a tiny town called Thor in Humboldt County at a house that was rented by an individual named Richard Fitzgerald, who was Mr. Yeager's cousin. Ms. Zemke and Mr. Yeager were in the process of moving into that home. The record below indicates that they'd spent approximately four nights at the home before this assault. The assault occurred at the home. At some point during the investigation, Deputy Corey Lampe from the Humboldt County Sheriff's Department learned from initially overhearing a conversation between Ms. Zemke and Lorene Marshall, Mr. Yeager's sister, who had responded to the scene that Mr. Yeager had a firearm in the house in Thor, and then in a conversation with Mr. Yeager on the way to the Humboldt County Jail, Mr. Yeager confirmed that he did in fact have a gun in the house. Where Bumper comes in is in the process of taking a statement from Ms. Zemke at the Humboldt County Law Enforcement Center. Deputy Lampe told her, we have to get the gun, or we're going to get the gun, something to that effect. There's no that statement was made by Deputy Lampe. You can look to page 64 of the transcript from the suppression hearing for that. There was no indication from Deputy Lampe that Ms. Zemke had the right to refuse law enforcement coming along to get the gun. There was evidence that Ms. Zemke did want to return to the house to get some of her belongings before leaving, and Ms. Zemke ultimately agreed to have Deputy Lampe, and eventually another deputy from the Humboldt County Sheriff's Department, accompany her at the house in Thor. So this was a circumstance where Ms. Zemke had no reason to believe that she could deny Deputy Lampe's instruction that they needed to get the gun, and she essentially needed to participate in recovering that gun. So I think it's a good reason, personal reason to agree. She did. She had a good personal reason to go back. Is this clear error review? This is voluntary consent as a matter of clear error. That's correct, your honor. But I think there's ample information in the record to show such clear error. This to me, she wanted to get her stuff. She did. I gather it was at least in the first, she was a bit scared of the cousin, and she wouldn't mind at all going back and getting her stuff when he wasn't there. She expressed that she was concerned as to how Mr. Yeager's cousin, Richard Fitzgerald, would react to... You get all these cases of the... Guns and domestic, yeah. Yeah, stop me if I start talking about the wrong case. But it seems to me that the clear error, particularly in clear error review, that there's a basis to infer that even though she later tried to help him at the hearing and was found not to be credible, she was quite willing and it was in her interest to have the police go back with her while she climbed in the window if that was needed. She didn't have a key. She knew the defendant wasn't there. She probably didn't... May have known Fitzgerald wasn't there. I just think it's... Your point about the authority is... Your case is not as strong as bumper, but it's certainly something that was, I'm sure, argued and presented. It was, Your Honor, and I agree this isn't as clear-cut as bumper or a case like United States versus Conner from this circuit in 1997, and coincidentally that originated from the Northern District of Iowa as well, where the cops said, we are coming in, we have to come into this particular hotel room, and this court found that that was not a situation where voluntary consent could be relied upon. But there is sufficient information in the record to show that Ms. Of course, we dispute the district court's factual finding that Ms. Zemke and Lorraine Marshall were not credible at the suppression hearing. I recognize it's a credibility finding and it's going to be difficult for Mr. Yeager to rely upon that here. But even setting that aside, setting the factual dispute aside, the factors that this court considers in deciding whether consent is voluntary do side in favor of Mr. Yeager nonetheless. There are certain factors that are admittedly in the government's favor. There's no evidence in particular that Ms. Zemke was intoxicated, that she was detained, although she was initially approached about going back to the house at the Humboldt County Law Enforcement Center. There's no allegation that Deputy Lampe threatened her in any express way, and ultimately she did participate in the search, more or less, when she crawled through the back window of this house in Thor to let the officers in. There are other factors that are pretty neutral. She's 26 years old, that's not young, that's not old by any means either, and there was no indication or no necessity to give her Miranda rights or anything of that nature. But there are a number of factors that do side in Mr. Yeager's favor. For one, the district court made a finding that Ms. Zemke was of average intelligence and strong-willed, and I'd submit that that finding was in error. Deputy Lampe actually testified at the suppression hearing, if you look to pages 70 and 71 of the transcript, that he found Ms. Zemke to be of below-average intelligence and perhaps naive and not well-educated. The district court didn't have any sound basis for rejecting Deputy Lampe's own assessment as to Ms. Zemke's level of intelligence. She had minimal experience in the past with law enforcement. She testified that she'd only been arrested once before for a misdemeanor, and that had been dismissed. This consent that she granted to Deputy Lampe for the entry into the home initially occurred, or initially was given, at the law enforcement center, so it wasn't in public in a place where she'd feel terribly comfortable. And then they drove in the dark of the night back to the tiny town of Thor, Iowa. There was testimony that there was no one around at the time, that they were in a circumstance where the reasonable person would feel comfortable with denying a law enforcement request. And ultimately, although we haven't pursued the point that she didn't have authority to grant the search, that's not something that I've brought on appeal, she did have a fairly minimal connection to the house. She'd only stayed there for about four days before then. So in my view, with that in mind, it would be easier to override her will in getting her to give her minimal connection to the house. It wasn't her home, she didn't have a key, and she didn't feel comfortable, as she said, denying law enforcement's consent to enter. If the panel doesn't have any questions, I'd reserve the remainder of my time for rebuttal. Very well. You may do so. Thank you. We'll hear from the government. Mr. Bowers, you may proceed. Good morning. Somewhere there's a button. I'm a low-altitude guy, so I need to get this a little lower. Yeah, we'll go with it. There we go. Good morning. I'm Jamie Bowers from Sioux City, on behalf of the government. The crux of this is this. It is another snowflake in the blizzard that you discussed in the Cross case a few minutes ago, and really stems from a domestic assault situation like the Cross case. The facts are different, of course, but similar in those regards. The meeting with the police officer and the victim of the assault was one of caring and looking after an abused person. The object of the meeting wasn't to get into this house and find a gun and ring the defendant here up on a felon in possession charge. It was one of addressing a call from the home of a good Samaritan, the neighbor lady, who said, hey, this lady's here in my house. She's been abused. She ran down the block. She needs help. Those of us in sophisticated, big city Sioux City. The initial contact, your honor. Yes, sir. No, but it stemmed from that. And the evening was couched in niceness and caring. The interaction between the police and the defendant's girlfriend, mother of his couple of kids. The neighbor lady said to the police officer, hey, I heard these girls talking about a gun in the house. They're kind of worried about it. You might want to check that out. And that's what happened. And the officer, once he had the defendant in his car for safekeeping, said, what's the deal about the gun? And the defendant explained that he did have a gun, a rifle. Whether true or not, he said he believed that he could have one. And there was a gun hanging in the living room on a nail on the wall back at this house. This is small town Iowa. And the officer was the lone ranger at the time. He went out to Thor, little tiny town, not much of a town. And he actually enlisted the aid of the defendant's sister to take the victim with him to the police department. And then once there, the typical conversation, what happened? What happened in this assault? Talked about being strangled a couple of times in the house, and where, and how long had you been living there? And do you want to go back and get your stuff? Those types of things. And that's what happened. Certainly, they wanted to go back and get the gun. They was concerned about it. It was unsafe. It was a scary situation. This young woman had lived there for four days, as had the defendant. They had some things there. She was worried about her clothes. The defendant said he was going to burn them up, a statement that came out in this part of the record. The defendant admitted to saying that. The crux of this, though, is, unfortunately, that it is a domestic abuse situation, that domestic abusers have power in the exercise of what I would say is a sad puppet show, oftentimes. As in the Cross case, in this case, what's this woman going to do? She comes into court, and my argument at the time was, Judge, she's in a tight spot. Does she say, no, I let the officers come in there? Or does she say, I've got to go back and live with this guy, the father of my children, and be the sole witness who hangs him up? A credibility determination was made by Judge Williams, and then after the R&R was set up, Judge Strand, on de novo review, said the same thing. The defendant's girlfriend and the defendant's sister were just not believable. They were not credible. Not to say they were evil liars, but they were in a tough spot. And Judge Williams evaluated their behavior, the way they answered questions. The answers to their questions, as the answers matched up with the facts on the ground that were undisputed or were recorded by audio tape. And the courts found that the two women were not pointedly lying, but they weren't telling the truth. And as this court has said in a number of different ways, in a number of iterations, those kind of credibility findings are not assailable. They're not- Virtually. Virtually. You're right. Virtually. And virtually is why we're here, because there is- Doesn't mean it could never be, but we know. The role of the court, though, is to decide what virtually versus never, ever, ever, ever. But in this case- I can't resist, although I should, but I do this all the time. Please. Judge Bennett, I found this interesting. Moreover, apparently Zemke then laid her back away from it and said, moreover, Zemke's willingness to abandon her efforts to retrieve her belongings from the house, smacks of recent invention, as no such factual claim was made in her affidavit. Smacks of recent- A nice literary flair to it. It does, and I call it the sad puppet show, but that's right. It's irrelevant, but it's interesting to read, Judge Bennett. He's a good writer. He's an interesting writer, I think. That's an irrelevant comment on my part, but disregard. Unless you have any more questions, that's the crux of my argument here. That's a good place to stop, I guess. I mean, the beginning of wisdom is to, when you've said what you have to say, stop. I haven't been accused of that much, but thank you. Well, thank you, and we thank you for the argument. Mr. Hanson. Your Honor, even if the court would accept the district court's credibility finding with respect to Ms. Zemke and Ms. Marshall, the court could still engage in the analysis required by Schneckloth v. Bustamante and this court's cases since then with regard to whether consent was voluntary, and for the reasons I addressed when I was initially up here, I don't believe that consent was voluntary in this particular case. If it were the case that Mr. Yeager could go back and easily reverse the district court's credibility finding, I think this would be a very easy case because Ms. Zemke would have made it very clear that she did not want to enter the home, that she did not feel comfortable continuing with this effort to find a window to break into. One thing I'll say with respect to Ms. Zemke, like I said before, the district court found that she was of average intelligence and also strong-willed. I think that finding was inconsistent because the imprimatur of the district court's order was that it seems that Ms. Zemke had been manipulated in some way by Mr. Yeager, which would suggest that she was not strong-willed. I don't view this as a sad puppet show. I think there are a number of factors here to suggest that law enforcement should have encountered this search differently. Finally, I'd point the court to the case of United States v. Pena-Saiz, S-A-I-Z 161F 3rd 1175, a case of an airport search where the cop told the person who submitted to the search that this is their job, we have to do the search. I do think that's the case that's closest on point. With that, I'd ask the court to reverse the district court. Very well, we thank you for your argument. The case is now submitted and we will take it under consideration.